

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-30-1999

# Mistick PBT v. Housing Auth Cty Pgh

Precedential or Non-Precedential:

Docket 97-3248

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

## Recommended Citation

"Mistick PBT v. Housing Auth Cty Pgh" (1999). *1999 Decisions.* Paper 222.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/222

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 30, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-3248

UNITED STATES OF AMERICA ex rel.
MISTICK PBT and MISTICK PBT,

v.

HOUSING AUTHORITY OF THE CITY OF PITTSBURGH;
L.D. ASTORINO & ASSOCIATES, LTD. (formerly known as
L.D. ASTORINO ARCHITECTS, INC.); ASTORINO BRANCH
ENVIRONMENTAL INC.; ASTORINO BRANCH ENGINEERS;
ERNEST E. MILLER, individually; DAVID B.
WASHINGTON, individually; LOUIS D. ASTORINO,
individually; DENNIS L. ASTORINO, individually; PATRICK
I. BRANCH, individually;
BERNARD J. QUINN, individually

Mistick PBT,

Appellant

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(D.C. No. 95-cv-01876)
(District Judge: Hon. Alan N. Bloch)

Argued June 9, 1998

Before: BECKER, Chief Judge, ALITO and ALDISERT,
Circuit Judges

(Opinion Filed: July 30, 1999)

David J. Hickton, Esq. (Argued)
James P. Thomas, Esq.
Burns, White & Hickton
2400 Fifth Avenue Place
120 Fifth Avenue
Pittsburgh, PA 15222

Attorneys for Appellees,
L.D. Astorino, Astorino Branch Env.,
Astorino Branch Eng., Louis D.
Astorino, Dennis L. Astorino, Patrick
I. Branch and Bernard J. Quinn

Arnd N. von Waldow, Esq.
Reed, Smith, Shaw & McClay
435 Sixth Avenue
Pittsburgh, PA 15219,

Attorney for Appellees,
Housing Authority of the City of
Pittsburgh, Ernest Miller and David
Washington

John E. Beard, III, Esq. (argued)
Peter N. Flocos, Esq.
Kirkpatrick & Lockhart LLP
1500 Oliver Building
Pittsburgh, PA 15222

Attorneys for Appellant

OPINION OF THE COURT

ALITO, Circuit Judge:

This appeal arises from a qui tam action based on the False Claims Act, 31 U.S.C. SS 3729 et seq. (1994). The District Court dismissed the complaint for lack of subject matter jurisdiction under 31 U.S.C. S 3730(e)(4)(A), which provides that no court has jurisdiction over a False Claims Act qui tam action that is based on certain public disclosures unless the action is brought by an "original source." We agree with the District Court that subject matter jurisdiction was lacking, and we therefore affirm.

I.

A. The qui tam action at issue here was filed by Mistick PBT, a Pittsburgh area construction company. Named as defendants were the Housing Authority of the City of Pittsburgh ("HACP") and L.D. Astorino & Associates, Ltd. an architectural firm, as well as individual employees of the HACP and Astorino & Associates. The complaint asserted that the defendants made false claims to the United States Department of Housing and Urban Development (HUD) for the cost of lead-based paint abatement work at the HACP's Bedford and Addison housing projects. Astorino was the architectural firm that developed the specifications for the lead-based paint abatement work, as well as the larger renovation projects of which this work formed a part, and Mistick was the general contractor for all of this work.

Since August 1986, HUD regulations have required lead-based paint abatement work to be performed at HUD-associated housing. See 24 C.F.R. SS 35.20 – 35.24 (1998). Such abatement may be achieved either by removing the paint or covering it with an "encapsulant" that covers and prevents exposure of the lead-based paint. See 24 C.F.R. S 35.24.

Astorino's original specifications for the lead abatement work at issue were submitted in approximately April or June of 1989 and provided for encapsulation using a product called "Glid Wall" that was manufactured by the Glidden Paint Company. According to Mistick's complaint, Mistick bid and later performed its work at the two projects on the basis of Astorino's specifications, including the Glid Wall specification. Mistick submitted its bids in June and July of 1989, and after those bids were accepted and contracts were executed, Mistick began work on the Addison project by December 1989 and on the Bedford project by January 1990.

Although Astorino's specifications called for the use of "Glid Wall" as an encapsulant, Glidden had begun recommending against the use of this product for this purpose some time earlier. A Glidden Product Updates Bulletin dated April 1988 stated:

> [GLIDDEN] WILL NOT RECOMMEND OR SELL ANY
> PAINT PRODUCT OR SHEET MATERIAL, SUCH AS
> GLID-WALL SYSTEM OR VINYL WALL COVERING,
> FOR USE OVER LEAD CONTAINING MATERIALS
> WHERE THE PURPOSE OF THE APPLICATION IS TO
> SEAL OR OTHERWISE RENDER THE AFFECTED
> AREA NON-HAZARDOUS.

JA 79.1

In June 1988, a firm of "protective coatings (paint) consultants" wrote to an Astorino employee that "Glidden Company has no desire to warrant [the Glid-Wall System] as a lead abatement product, and therein lay their admonition regarding its use for that purpose." JA 82. According to the affidavit of D. Thomas Mistick, a principal of Mistick PBT, representatives of Astorino, the HACP, and Mistick attended a meeting on January 5, 1990, at which a Glidden representative reiterated the warning contained in the April 1988 Products Update Bulletin. JA 547. In addition, it appears that, on January 23, 1990, Glidden sent Astorino a letter advising that "the Glidwall System can not be consider (sic) a method for lead abatement." JA 450.

In May 1990, Astorino revised its specifications for the Bedford and Addison projects and provided for the use of a lead encapsulant called Zomat instead of Glid-Wall. This change was preceded by a series of letters from Astorino to the HACP. On February 14, 1990, Dennis Astorino, a vice-president of the architectural firm, wrote to Ernest Miller, the HACP's director of development, and attached a letter from Astorino's certified industrial hygienist stating that his company was "still of the opinion that the Glidwall System is the most cost effective method of physical compliance with the HUD criteria," although "an increased element of risk would be associated with the use of the Glid-Wall System since the manufacturer, Glidden, indicates the Glid-Wall System is not to be considered as a method for lead abatement." JA 449. Dennis Astorino's cover letter requested a prompt decision by the HACP regarding the method of abatement it wished to use -- either

_____

1. "JA" refers to the Joint Appendix.

encapsulation using Glid-Wall or some other product or the removal of the lead paint. Id.

On April 23, Dennis Astorino again wrote to Miller and summarized the events that had resulted in the original specification of Glid-Wall. Among other things, the letter stated that Astorino's consultants had advised thefirm that "Glid-Wall was the encapsulating system of choice" but that Glidden "no longer recommend[ed] their product as a lead base paint encapsulate and, in fact, [was] actively advising against it's (sic) use." JA 435. The letter added: "We understand this was do (sic) to potential corporate liability concerns." Id. The letter concluded by stating that the field of alternative encapsulants had been narrowed to Zomat. JA 436.

On April 24, Dennis Astorino wrote another letter to Miller in which he again stated that Glidden "no longer guarantees [Glid-Wall] for use as a lead base paint encapsulate" and again expressed the view that Zomat was then "the best solution to the problem of encapsulization." JA 434. After observing that Zomat could not have been called for in the original specifications because it had only recently been marketed as an encapsulant, the letter requested additional funding of approximately $750,000 for the Bedford project alone. Id.

Seeking to have HUD fund these cost increases, the HACP sent several letters to HUD in 1990 and 1992. On April 27, 1990, David Washington, the HACP's executive director, wrote to John Pisano, the manager of HUD's Pittsburgh office, and stated that the HACP needed additional funding for the Bedford project because Glidden "no longer recommends" Glid-Wall as a lead encapsulant. This letter had several attachments, including the February 14, April 23, and April 27 letters from Astorino to the Authority. JA 418-19.

On January 1, 1992, Miller wrote to Paul LaMarca, Acting Director of the Public Housing Division of HUD's Pittsburgh office, and requested additional funding from HUD for the Bedford project. Miller cited the fact that Glidden no longer recommended Glid-Wall as an encapsulant and that new regulations required "additional worker protection methods." JA 457.

5

On July 1, 1992, in response to LaMarca's request for more information, Washington wrote to LaMarca and stated that "Glidwall became unacceptable as a LBP [lead-based paint] encapsulant because the Company informed the Architect by letter (1/23/90) that `the Glidwall System can not be consider (sic) a method for lead abatement,' in spite of the fact that the system met HUD requirements in effect at the time and that the Baltimore Housing Authority was using it for this purpose." JA 464-65. Apparently referring to the situation at the time of the original specifications, the letter added:

> To our knowledge, there was no information available to suggest that the Glidwall System was not approved by Glidden for its intended use as a LBP encapsulant.

JA 465.

On July 24, 1992, HUD informed the HACP that it was approving $253,622.11 in additional funds for lead encapsulation on the Bedford project. JA 469.[2]

B. Meanwhile, in July 1991, Mistick had filed su it against the HACP in the Court of Common Pleas of Allegheny County, claiming that the HACP was liable to Mistick under their contract for delay damages resulting from the change in the lead-abatement specifications for the Bedford and Addison projects. The HACP thenfiled a third-party complaint for indemnification and contribution against Astorino, and Mistick subsequently moved to amend its complaint to add a direct claim of fraud against Astorino. In this proposed amended complaint, Mistick alleged that (1) Astorino knew at the time it developed the original specifications for the Bedford and Addison projects that Glidden did not recommend Glid-Wall as a lead-based paint encapsulant, (2) Astorino nonetheless specified Glid-Wall for lead abatement, (3) Astorino knew or should have known that this specification would delay and increase the cost of the renovation work, and (4) the Bedford and Addison projects were both delayed and Mistick suffered damages as a result. JA 226-27. In the alternative, Mistick

_____

2. Mistick alleges that the HACP received additional funds for the Bedford and Addison projects through HUD's annual budget process.

alleged that the HACP knew that Glid-Wall was unsuitable for use a lead-based paint encapsulant but that it directed Astorino to specify this product anyway, knowing that this would cause delay and increased expense. JA 227. The Court of Common Pleas denied Mistick's motion to amend its complaint because, among other things, the statute of limitations had run on Mistick's claim against Astorino, and the Court dismissed Astorino as a third-party defendant.

Dennis Astorino gave a deposition in the state court action in which he acknowledged that the Astorinofirm knew, prior to the submission of the original Bedford and Addison specifications, that Glidden did not recommend the use of Glid-Wall as an encapsulant. JA 99-100. Louis Astorino, another principal of the firm, likewise stated in a deposition that the firm was aware that Glid-Wall had "never" been warranted as a lead-based paint encapsulant, but that he looked at Glid-Wall "as a product approved by HUD for this situation" and that "HUD never asked for a warranty for lead based paint abatement." JA 85-87. Mistick's suit against the HACP was eventually settled in May 1996.

C. While its suit against the HACP was pending in state court, Mistick began what it terms "an investigation . . . undertaken . . . for the purpose of gathering information on the HACP's relationship with HUD, which investigation was entirely separate and distinct from and independent of the [suit in state court]." Appellant's Br. at 11. This investigation was supposedly prompted by "a series of serious administrative problems and construction disputes Mistick and other contractors were experiencing, with both the HACP and Astorino, on various HUD-associated public housing project construction jobs in the Pittsburgh area." JA 539.

As part of this investigation, Mistick's attorney, David M. Priselac, Esq., filed a Freedom of Information Act ("FOIA") request with HUD in September 1993, and in response, HUD released several files for Pittsburgh-area HUD-funded projects, including the Bedford and Addison projects. These files included the Authority's letters to HUD, dated April 27, 1990, January 1, 1992, and July 1, 1992, as well as the

7

letters from Astorino to the HACP that were attached to the April 27 letter. Mistick viewed the letters submitted to HUD as containing false claims regarding the Glid-Wall matter.

D. In November 1995, Mistick filed under seal this qui tam action in its own name and on behalf of the United States. Mistick's complaint alleged that two false claims had been presented to the government. The first claim involved the original specifications, which called for the use of Glid-Wall as an encapsulant even though certain defendants allegedly knew that it was not suited for that purpose. The second claim concerned the HACP's request for additional funding to pay for part of the cost of switching to Zomat as the encapsulant and the allegedly false statements made regarding the reasons for the switch. Based on each of these two claims, the complaint asserted three separate causes of action: for presentation of a false claim, in violation of 31 U.S.C. S 3729(a)(1); for making or using a false record or statement, in violation of 31 U.S.C. S 3729(a)(2); and for conspiring to defraud the government, in violation of 31 U.S.C. S 3729 (a)(3).

In July 1996, the District Court granted the Government's motion to decline intervention and ordered that Mistick's complaint be unsealed and served on the HACP and Astorino. The HACP and Astorino filed separate motions to dismiss, in which they asserted lack of subject matter jurisdiction. In March 1997, the District Court dismissed for lack of subject matter jurisdiction under 31 U.S.C. S 3730(e)(4)(A), which, as noted, provides that no court has jurisdiction over a False Claims Act qui tam suit that is based on certain specified types of public disclosures unless the action is brought by an "original source." The District Court held that this jurisdictional bar applied because Mistick's action was based on information obtained by Mistick pursuant to a FOIA request and discovery in the state court proceeding and because Mistick did not qualify under the Act's "original source" exception. Mistick then took this appeal.

II.

The background of the False Claims Act's qui tam provision has been discussed in detail in prior opinions.

8

See United States ex rel. Dunleavy, 123 F.3d 734, 738 (3d Cir. 1997); United States ex rel. Stinson, 944 F.3d 1149, 1152–54 (3d Cir. 1991); id. at 1162–68 (Scirica, J., dissenting). In brief, the qui tam provision "permits, in certain circumstances, suits by private parties on behalf of the United States against anyone submitting a false claim to the Government. Prior to 1986, such suits were barred if the information on which they were based was already in the Government's possession." Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939, 941 (1997). In 1986, Congress sought "[t]o revitalize the qui tam provisions," Stinson, 944 F.2d at 1154. After considering several alternatives, see Stinson, 944 F.2d at 1163–68 (Scirica, J., dissenting), Congress enacted 31 U.S.C. S 3730(e)(4)(A), which provides:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office (sic) report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

As previously noted, the District Court held that this provision bars Mistick's suit. Mistick argues that the District Court's decision rests on three erroneous legal determinations. First, Mistick contends that the disclosure of information in response to the Priselac FOIA request was not one of the kinds of public disclosure that trigger the jurisdictional bar set out in 31 U.S.C. S 3730(e)(4)(A). Second, Mistick maintains that its state-court suit did not involve the same "allegations" or "transactions" as its later qui tam action. Third, Mistick argues that it fell within the "original source" exception.

A. The FOIA response. As noted, the qui tam provision refers to "the public disclosure of allegations or transactions in a criminal, civil, or administrative, or Government Accounting Office (sic) report, hearing, audit, or investigation, or from the news media." 31 U.S.C. S 3730(e)(4)(A). Thus, in order to fall within this language,

9

a disclosure (1) must be "public" and (2) must occur in one of the specified contexts. HUD's response to the Priselac FOIA request satisfies both of these requirements.

First, the disclosure of information in response to a FOIA request is a "public disclosure." The Freedom of Information Act states that "[e]ach agency shall make available to the public" certain specified categories of information. 5 U.S.C. S 552(a)(emphasis added). The Act's "central purpose" is to ensure that government activities are "opened to the sharp eye of public scrutiny." United States Dep't of Justice v. Reporter's Comm., 489 U.S. 749, 774 (1989)(emphasis added). In Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102 (1980), the Supreme Court held that the disclosure of information pursuant to the FOIA constitutes a "public disclosure" within the meaning of the Consumer Product Safety Act, 15 U.S.C. S 2055(b)(1), and the Court observed:

> [A]s a matter of common usage the term "public" is properly understood as including persons who are FOIA requesters. A disclosure pursuant to the FOIA would thus seem to be most accurately characterized as a "public disclosure" within the plain meaning of [the Consumer Product Safety Act].

447 U.S. at 108-09 (emphasis added). We see no sound basis for construing the term "public disclosure" any more narrowly here than the Supreme Court did in GTE Sylvania. We therefore conclude that HUD's response to the Priselac FOIA request was a "public disclosure."[3]

_____

3. The dissent argues that information produced pursuant to a FOIA request is not publicly disclosed because it is provided only to the requester, who is not obligated to turn it over to others. Dissent at 28-29. The dissent therefore contends that the information is not "publicly accessible," id. at 28, and thus seems to suggest that "public disclosure" means making information accessible.

We disagree with the dissent that information available under FOIA is not "publicly accessible"; on the contrary, such information is readily accessible to any member of the public who makes a request. More important, however, the dissent's argument confuses the statutory concept of "public disclosure" with the different concept of "public

Second, this disclosure occurred within one or more of
the contexts specified in 31 U.S.C. S 3730(e)(4)(A). To begin,
we believe that HUD's response constituted an
"administrative . . . report." Id. In Dunleavy, 123 F.3d at
745, we concluded that the term " `administrative' when
read with the word `report' refers only to those
administrative reports that originate with the federal
government." HUD's response to the FOIA request
originated with a department of the federal government and
constituted official federal government action, and therefore
this response plainly satisfied Dunleavy's definition of
"administrative."

The response also fell within the ordinary meaning of the
term "report." A "report" is defined as, among other things,
"something that gives information" or a "notification,"
Webster's Third New International Dictionary 1925 (1971),
and an "official or formal statement of facts or proceeding."
Black's Law Dictionary 1300 (6th ed. 1990). A response to
a FOIA request falls within these definitions. Such a
response provides information and notification regarding
the results of the agency's search for the requested
documents and constitutes an official and formal statement
concerning those results. Although Mistick ridicules the
argument that a response to a FOIA request is an
"administrative report," see Reply Br. at 6-7, it is telling
that Mistick does not offer a definition of this term.4 We

_____

accessibility." Information may be publicly disclosed -- for example, it
may appear buried in an exhibit that is filed in court without fanfare in
an obscure case -- and yet not be readily accessible to the general
public. And information may be easily accessible to the public -- it may
be available under FOIA to anyone who simply files a request -- but
unless there is a request and the information is actually produced, it is
not publicly disclosed. Dunleavy, 123 F.3d at 746.

4. The dissent argues that a FOIA response is not a report, but the
dissent -- which elsewhere adheres strictly to the dictionary definition
of
the statutory phrase "based upon" (see Dissent at 32) -- does not come
to grips with the fact that a FOIA response falls easily within accepted
definitions of the term "report." The dissent seems to have in mind a
particular type of government report, with "analysis," a "summary,"
and/or a "conclusion," see id. at 29, but the ordinary understanding of
the term "report" is broader.

11

thus hold that HUD's response to the Priselac FOIA request was an "administrative . . . report" and that the documents that HUD provided were publicly disclosed "in" that "report."5

We also believe that this response occurred "in a[n] . . . administrative . . . investigation." 31 U.S.C.S 3730(e)(4)(A). For the reasons already explained, HUD's search for the documents sought under the FOIA and its decision to disclose them clearly satisfied our court's interpretation of the term "administrative," and we believe that these processes should be viewed as constituting an "investigation" within the meaning of 31 U.S.C. S 3730(e)(4)(A). Accepted definitions of the term "investigation" include "a detailed examination," Webster's Third New International Dictionary 1189 (1971), and the "making of a search." 1 The Compact Edition of the Oxford English Dictionary 457 (1971). When an agency receives a FOIA request, it is obligated to conduct a search that is reasonably calculated to uncover all relevant documents.6 See also, e.g., Miller v. United States Department of Justice, 779 F.2d 1378, 1383 (D.C. Cir. 1983); Weisberg v. United States Department of Justice, 705 F.2d 1344, 1351 (D.C. Cir. 1983). Such a search falls within the common understanding of the term "investigation." 7 See also 5

_____

5. This holding is entirely consistent with our holding in Dunleavy that a report prepared at the behest of a county was not itself an "administrative report" because it did not"originate with the federal government." 123 F.3d at 744-46. In Dunleavy, the report was not produced under the FOIA. Here, we do not hold that the documents at issue would have fallen within S 3730(e)(4)(A) had they not been produced pursuant to the FOIA. Rather, we hold that HUD's FOIA response was an "administrative report" and the documents were publicly disclosed "in" that report, just as if they had been reproduced as an appendix to a printed report.

6. As with the term "report" (see footnote 4, supra), the dissent insists on
an interpretation of the term "investigation" that is narrower than its meaning in ordinary usage. According to the dissent, the term "investigation" seems to be limited to a criminal investigation or a like investigation of "wrongdoing." Dissent at 29. But in ordinary usage, the term is used more broadly.

7. Because we hold that the disclosure at issue occurred in an "administrative . . . report" and an "administrative . . . investigation," we
need not and do not reach the defendants' argument that the disclosure also occurred in an "administrative . . . hearing."

12

U.S.C. S 552(a)(3)(D) ("For purposes of this paragraph, the term `search' means to review, manually or by automated means, agency records for the purpose of locating those records which are responsive to a request.')

Most of the decisions of other courts support our holding that the disclosure of documents under the FOIA triggers the jurisdictional bar of 31 U.S.C. S 3730(e)(4)(A). In United States ex rel. Schumer v. Hughes Aircraft Co., 63 F.3d 1512, 1520 (9th Cir. 1995), vacated on other grounds, 520 U.S. 939 (1997), the Ninth Circuit stated that documents actually produced in response to FOIA requests are publicly disclosed for purposes of the qui tam statute. See also United States ex rel. Lamers v. City of Green Bay, 998 F. Supp. 971, 979 (E.D. Wis. 1998), aff'd, 168 F.3d 1038 (7th Cir. 1999); United States of America ex rel. Burns v. A.D. Roe Co., Inc., 919 F. Supp. 255, 257 (W.D. Ky. 1996); United States ex rel. Herbert v. National Academy of Sciences, 1992 WL 247587, at *6 (D.D.C. Sept. 15, 1992) ("Just as civil discovery is public, it must be the case that information obtained pursuant to an FOIA request has been made public through the administrative process and cannot form the basis of a qui tam action. If that were not the case then, like court records, public agency records would be flooded with citizens requesting information in order to bring qui tam suits. Congress did not intend the qui tam provision to transform FOIA from sunshine legislation into a search for the pot of gold at the end of the rainbow."). But see United States ex rel. Pentagen Technologies Int'l Ltd. v. CACI Int'l Inc., 1996 WL 11299, at *9 (S.D.N.Y. Jan. 4, 1996)

B. The Mistick State Court Action. Mistick argues that even if HUD's FOIA response was a covered disclosure under 31 U.S.C. S 3730(e)(4)(A), its qui tam action was still not jurisdictionally barred. We have held that the public disclosure of a "transaction[ ]" within that provision requires the disclosure of "the elements of the underlying fraudulent transaction." Dunleavy, 123 F.3d at 740. This means that the disclosure must reveal both the misrepresented state of facts and the true state of facts so that the inference of fraud may be drawn. Id. at 741. Mistick acknowledges that "[t]he misrepresented facts . . .

13

were discovered by Mistick in October 1993, pursuant to the Priselac [FOIA] Request." Appellant's Br. at 31. Thus, our holding that this disclosure falls within the coverage of 31 U.S.C. S 3730(e)(4)(A) requires Mistick to fall back on the argument that the jurisdictional bar is not triggered "because the other essential element, the true state of facts, was not publicly disclosed within the meaning of that provision." Id. at 33.

We reject Mistick's fall-back argument because "the true state of facts" was disclosed in civil discovery in the Mistick state court action, and we held in Stinson, 944 F.2d at 1160, that civil discovery constitutes "a public disclosure . . . in a civil hearing" within the meaning of 31 U.S.C. S 3730(e)(4)(A). According to Mistick, the true facts were (1) that the Glidden policy of not recommending Glid-Wall as a lead-based encapsulant was in effect before Astorino submitted the specifications and (2) that Astorino and the Authority were aware of the policy but knowingly represented otherwise to HUD. As previously noted, both Dennis and Louis Astorino acknowledged these facts in their depositions, and Mistick concedes that all of these facts were revealed in civil discovery in the state court action. At oral argument, the following exchange occurred:

> THE COURT: . . . [D]o I understand your answer to be that all of the essential elements were publicly disclosed in the civil litigation but you knew all of those essential elements previously from other sources, including the FOIA request?
>
> MR. BEARD: That is correct.

Oral Arg. Tr. at 10.

Mistick contends, however, that although all of the essential elements were revealed in either the FOIA response or in civil discovery, its qui tam action was not "based on" those public disclosures. This argument requires us to consider conflicting decisions from several other circuits regarding the meaning of the phrase "based upon" in 31 U.S.C. S 3730(e)(4)(A).

In United States ex rel. Siller v. Becton Dickinson & Co., 21 F.3d 1339, 1348 (4th Cir.), cert. denied, 513 U.S. 928

14

(1994), the Fourth Circuit held that "based upon" means actually derived from. The court explained:

> Section 3730(e)(4)(A)'s use of the phrase "based upon" is, we believe, susceptible of a straightforward textual exegesis. To "base upon" means to "use as a basis for." Webster's Third New International Dictionary 180 (1986) (definition no. 2 of verb "base"). Rather plainly, therefore, a relator's action is "based upon" a public disclosure of allegations only where the relator has actually derived from that disclosure the allegations upon which his qui tam action is based. Such an understanding of the term "based upon," apart from giving effect to the language chosen by Congress, is fully consistent with section 3730(e)(4)'s indisputed objective of preventing "parasitic" actions see, e.g., Stinson, supra, at 1154, for it is self-evident that a suit that includes allegations that happen to be similar (even identical) to those already publicly disclosed, but were not actually derived from those public disclosures, simply is not, in any sense, parasitic.

Id.

All of the other circuits that have reached this question have disagreed with the Fourth Circuit and have held that "based upon" means "supported by" or "substantially similar to," so that the relator's independent knowledge of the information is irrelevant. See United States ex rel. Biddle v. Board of Trustees of the Leland Stanford, Jr. Univ., 147 F.3d 821, 828 (9th Cir. 1998), cert. denied, ___ S. Ct. ___, 1999 WL 66673 (U.S. Apr. 19, 1999); United States ex rel. Findley v. FPC-Boron Employees' Club, 105 F.3d 675, 682-84 (D.C. Cir.), cert. denied, 118 S. Ct. 172 (1997); United States ex rel. Precision Co. v. Koch Indus., Inc., 971 F.2d 548, 552 (10th Cir. 1992), cert. denied, 507 U.S. 951 (1993); United States ex rel. Doe v. John Doe Corp., 960 F.2d 318, 324 (2d Cir. 1992).

In reaching this conclusion, the Tenth Circuit observed that "[a]s a matter of common usage, the phrase `based upon' is properly understood to mean `supported by.' " Precision Co., 971 F.2d at 552. The District of Columbia Circuit, while not expressly embracing the Tenth Circuit's

15

view that "based upon" may mean "supported by" in common usage, found the statutory language to be ambiguous, and then rejected the Fourth Circuit's approach "because it renders the `original source' exception to the public disclosure bar largely superfluous." Findley, 105 F.3d at 683. After observing that the False Claims Act "requires that a relator have `direct and independent' knowledge of the alleged fraud or some of its components, and have voluntarily provided the information to the government, in order to benefit from the `original source' exception to the jurisdictional bar," the court continued:

> Why, one may ask, assuming the Fourth Circuit test of "based upon" as meaning "derived from," would Congress provide an exception in the case of a relator who has actually derived his complaint from public information, that allows him to demonstrate that he already provided his independently obtained knowledge to the government before he filed suit? . . .[U]nder the Fourth Circuit's interpretation, the primary "based upon" test swallows the original source exception whole. Using "based upon" as a proxy for whether the relator's complaint merely parrots what is already in the public domain, on the other hand, leads logically to a subsidiary inquiry into whether, the relator had obtained the information in his complaint independently prior to the disclosure and so is an "original source."

Id.

We see merit in both the Fourth and District of Columbia Circuits' arguments. We agree with the Fourth Circuit that in ordinary usage the phrase "based upon" is not generally used to mean "supported by." On the other hand, we agree with the District of Columbia Circuit that the Fourth Circuit's interpretation is suspect because it would render the "original source" exception largely superfluous. The dissent strives to show that the Fourth Circuit's interpretation might not render the original source exception entirely superfluous, but we are not persuaded.

The dissent first argues that it may be possible for the allegations or transactions set forth in an individual's claim

16

to be derived from a public disclosure, see 31 U.S.C.
S 3730(e)(4)(A), and yet for that individual to have had
direct and independent prior knowledge of "the information
on which the allegations are based." 31 U.S.C.
S 3730(e)(4)(B). The dissent writes that "a relator who is
barred because he has derived some of his fraud
information from a public disclosure may still bring the
claim as an original source if he has direct and
independent knowledge of some other essential element of
the claim." Dissenting Op. at 39-40. However, the dissent
makes no effort to explain how this interpretation can be
made to fit the language of 31 U.S.C. SS 3730(e)(4)(A) and
31 U.S.C. S 3730(e)(4)(b) (the "original source" exception).
Indeed, the dissent does not even commit itself to this
interpretation but merely raises it as a possibility. See
Dissenting Op. at 40. Thus, the dissent relies on the
possibility that the apparent superfluity of the"original
source" exception (under its interpretation of"based upon")
may be avoided pursuant to a scheme of interpretation that
it declines to explicate or embrace. We find this
unconvincing.

The dissent's second argument, as we understand it, is
that, even if its interpretation of "based upon" makes the
"original source" exception substantively superfluous,
Congress might have adopted that exception in order to
provide a different procedural avenue for a qui tam relator
to use in showing that his action was not derived from a
public disclosure. The dissent writes that "it may be easier
for the relator to establish himself as an `original source' of
the information than to successfully disprove a caused link
between the public disclosures and his qui tam claim."
Dissent at 40. However, even if there were no "original
source" exception as such, an individual could still prove
that his information was not derived from a public
disclosure by showing that he was an original source of the
information. Thus, this argument fails to explain why
Congress would have adopted the "original source"
exception if the phrase "based upon" in 31 U.S.C.
S 3730(e)(4)(A) meant "derived from." As a result, we agree
with the District of Columbia Circuit that the Fourth
Circuit's interpretation of "based upon" makes the "original
source" exception largely superfluous.

17

We are thus confronted with a clash between two textual arguments concerning the meaning of 31 U.S.C. S 3730(e)(4)(A): one based on the ordinary meaning of the phrase "based upon" and one based on the precept that a statute should be construed if possible so as not to render any of its terms superfluous. See, e.g ., United States v. Nordic Village, Inc., 503 U.S. 30, 36 (1992); Astoria Federal Savings & Loan Assn. v. Solimino, 501 U.S. 104, 112 (1991); First Bank Nat. Ass'n v. FDIC, 79 F.3d 362, 367 (3d Cir. 1996); United Steelworkers of America v. North Star Steel Co., 5 F.3d 39, 42 (3d Cir. 1993), cert. denied, 510 U.S. 1114 (1994). In the end, we are persuaded to follow the majority approach.

Section 3730(e)(4)(A) does not reflect careful drafting or a precise use of language. To begin with a small example, this section refers to the General Accounting Office as the "Government Accounting Office" and thus misnames an instrumentality that Congress has consistently viewed as its own. See Bowsher v. Synar, 478 U.S. 714, 731 (1986). The section refers awkwardly to "the public disclosure . . . from the news media." Id. (emphasis added). The section refers to criminal and civil "hearing[s]," when it surely means, not just those proceedings that are generally labeled "hearings," but also full-blown criminal and civil trials, and other court proceedings that are not described as "hearings" in standard usage. See Stinson, 944 F.2d at 1154-58. The section refers to jurisdiction over"an action" that is based on a public disclosure, and thus the drafters seem to have overlooked the elementary point that a qui tam "action" may contain multiple claims, only some of which may be "based upon" a public disclosure, however that phrase is defined. In addition, whether the phrase "based upon" means "derived from" or"supported by," a careful drafter would have realized the need to specify the degree to which the "action" must be "based upon" the public disclosure in order to fall within the jurisdictional bar.[8] Section 3730(e)(4)(A) refers to the disclosure of"allegations or transactions," but S 3730(e)(4)(B), in referring to independent knowledge "of the information on which the allegations are based," inexplicably fails to mention

_____

8. We were required to decide this point in Dunleavy, 123 F.3d at 746.

18

"transactions." (Are "transactions" irrelevant under this latter provision? Are they subsumed within the concept of "allegations"?) The inescapable conclusion is that the qui tam provision does not reflect careful drafting.

In light of this apparent lack of precision, we are hesitant to attach too much significance to a fine parsing of the syntax of S 3730(e)(4)(A). We find Section 3730(e)(4)(A) to be syntactically ambiguous because we are uncertain that the drafters of that provision focused on the difference in precise usage between, on the one hand, a suit based upon a public disclosure of an allegation or transaction and, on the other, a suit based upon an allegation or transaction and that has been publicly disclosed.9  Under these circumstances, we think that it is best to follow the majority interpretation, which is much more consistent with the rest of the qui tam provision. We thus hold that a qui tam action is "based upon" a qualifying disclosure if the disclosure sets out either the allegations advanced in the

_____

9. Although we do not rely on the legislative history of the qui tam provision in reaching this conclusion, see Stinson, 944 F.2d at 1154, it is interesting that sponsors of the 1986 False Claim Act Amendments described it as having a meaning consistent with our holding. Senator Grassley, one of original Senate sponsors, in speaking of the technical and clarifying amendments that introduced the present language in S 3730(e)(4)(A), stated:

>       [J]urisdiction for qui tam actions based on information that has
>       been publicly disclosed will be limited to those people who were
>       "original sources" of the information . . . .

132 Cong. Rec. S11238-04 (Aug. 11, 1986) (emphasis added). Similarly, Representative Berman, one of the sponsors of the House bill, submitted "legislative history" that stated in relevant part:

>       Before the relevant information regarding fraud is publicly
disclosed
>       through various government hearings, reports and investigations
>       which are specifically identified in the legislation or through the
>       news media, any person may file such an action as long as it is
filed
>       before the government filed an action based upon the same
>       information. Once, the public disclosure of the information occurs
>       through one of the methods referred to above, then only a person
who
>       qualifies as an "original source" may bring the action.

132 Cong. Rec. H9382-03 (Oct. 7, 1986) (emphasis added).

qui tam action or all of the essential elements of the qui tam action's claims. Because the latter condition is satisfied here, the qui tam action at issue was "based upon" qualifying disclosures and is consequently subject to the jurisdictional bar of S 3730(e)(4)(A) unless it is saved by the "original source" exception, to which we next turn.

C. "Original source" exception. Section 3730(e)(4)(A)'s jurisdictional bar does not apply if "the person bringing the action is an original source of the information." Section 3730(e)(4)(B) (emphasis added) defines an "original source" as

>      an individual who has direct and independent
>      knowledge of the information on which the allegations
>      are based and has voluntarily provided the information
>      to the Government before filing an action under this
>      section which is based on the information.

Here, Mistick is not an "original source" because it did not have "direct and independent knowledge" of the most critical element of its claims, viz., that the Authority had made the alleged misrepresentations to HUD regarding its knowledge about Glid-Wall's unsuitability as a lead-based paint encapsulant at the time of the original specifications. "[A] relator who would not have learned of the information absent public disclosure [does] not have `independent' information within the statutory definition of `original source.' " Stinson, 944 F.2d at 1160. As previously noted, Mistick acknowledges that "[t]he misrepresented facts were discovered by Mistick in October 1993, pursuant to the Priselac FOIA Request." Appellant's Br. at 31. Since HUD's FOIA response was a qualifying public disclosure under S 3730(e)(4)(A), Mistick was not an original source of that information. While "it is not necessary for a relator to have all the relevant information in order to qualify as `independent,' " Stinson, 944 F.2d at 1160, a relator cannot be said to have "direct and independent knowledge of the information on which [its fraud] allegations are based," 31 U.S.C. S 3730(e)(4)(B), if the relator has no direct and independent knowledge of the allegedly fraudulent statements. Thus, Mistick's "original source" argument fails.

20

III.

In summary, we hold that Mistick's qui tam action was barred by 31 U.S.C. S 3730(e)(4)(A) because it was "based upon the public disclosure" of the relevant transactions in an "administrative . . . report" and "investigation" (HUD's search for the documents sought in the FOIA request and its response to that request) and in a "civil . .. hearing" (discovery in Mistick's state-court action) and because Mistick does not qualify as an "original source."10 We therefore affirm the decision of the District Court.

_____

10. In light of our disposition of these issues, we find it unnecessary to address the other grounds for affirmance that the defendants have advanced.

BECKER, Chief Judge, dissenting:

Judge Alito's majority opinion cuts through this enormously complicated area of the law in a candid and straightforward manner. While the result it reaches is not unreasonable, it is, I respectfully submit, incorrect. On the critical "based upon" issue, Judge Alito follows the majority view of other circuits. As I will explain, I would follow the minority view, primarily because it alone is faithful to the plain language of the governing statute. More particularly, I do not believe that the phrase "based upon," especially in the context in which it is found in the False Claims Act ("FCA"), can properly be read to mean, as the majority here concludes, "supported by." Rather, it means"derived from" or "used as a basis for." I take issue with the majority's contention that we may avoid this plain reading of"based upon" because Congress was sloppy in its drafting of the jurisdictional bar. I also follow the minority view because I believe that it better reflects the policy that Congress had in mind in its most recent amendments to the FCA. Finally, I believe that the present majority is incorrect in asserting that a plain reading of "based upon" would render the "original source" exception superfluous.

On the "public disclosure" issue, the majority feels bound by our prior caselaw, particularly United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Insurance Co., 944 F.2d 1149 (3d Cir. 1991). While we are constrained to follow our binding precedent, I disagree with the majority's broad reading of Stinson, which arose in a very different context--civil litigation--than that involved here. More specifically, I believe that materials obtained through a FOIA request do not constitute a "public disclosure" under the FCA, even given our holding in Stinson, because a government agency's act of locating and duplicating records for a single FOIA requester is fundamentally different from the disclosure of discovery material in civil litigation, which includes a "presumption . . . of public access." Stinson, 944 F.2d at 1159.

These readings of the statute compel the conclusion that the jurisdictional bar does not apply in this case. First, if, as I believe, the FOIA material does not constitute a public disclosure, Mistick would not be barred from bringing its

22

qui tam action, given our prior caselaw. Second, under my interpretation of "based upon," Mistick's qui tam action would not be barred if it obtained the information underlying its claim from a source other than a public disclosure. It has so alleged, and this may in fact be the case. Therefore, even if the FOIA material is deemed a public disclosure, I would still reverse the District Court's decision dismissing Mistick's qui tam claim and remand for a determination by that court whether the claim is"based upon," i.e., derived from, information in any public disclosures. Because I would reverse the District Court's determination that Mistick's claim is "based upon" public disclosures, I would not reach the question whether Mistick is an original source of the information in any public disclosures.

So that it is fresh in our minds as we weave our way through this statutory maze, I rescribe the relevant jurisdictional bar:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. S 3730(e)(4)(A) (1994). As it will make for a more orderly discussion, I will first address the public disclosure issue. In the course of that discussion, the tenor of which is adumbrated above, I will explain why I believe Stinson to have been wrongly decided and hence a candidate, at some point in time, for en banc consideration.

I. Public Disclosures

The majority concludes that both the information in the state-court discovery and the product of Mistick's FOIA request constituted public disclosures. I am constrained to agree with the first of these holdings, as this was the precise issue decided in Stinson. However, I dissent from

23

the second, as I do not believe that Stinson--even if it were correctly decided--inexorably leads to the conclusion that information obtained through a FOIA request by a single individual is necessarily a "public disclosure." Explication of my position on the FOIA issue will be informed by explaining at the outset my problems with Stinson's definition of public disclosure, under which discovery material given to a single person in litigation between two private parties, and not even filed with a court, constitutes a "public disclosure."

In Stinson, the panel majority reasoned that "section 3730(e)(4) [is] designed to preclude qui tam suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator." Stinson, 944 F.2d at 1155-56. It specifically held that "[i]nformation gleaned in litigation and on file in the clerk's office falls in this category," even if the information is actually known only to the small group of private litigants involved in the action in which the information was presented through discovery. Id. at 1156; see also id. at 1158 ("[D]isclosure of discovery material to a party who is not under any court imposed limitation as to its use is a public disclosure under the FCA.").

The holding in Stinson was based in part on the fact that "the Local Rules of some district courts provide that the court may order the filing of discovery materials at the request of any person who has an interest in reviewing the materials." Id. at 1158-59. Although the panel may have been technically correct, this statement obscures the actual situation in most federal courts. In this circuit, every U.S. district court proscribes by local rule the filing of discovery material.1 The assumption that the right to seek access to such unfiled materials by requesting their filing, see infra note 2, will be availed of in any but a handful of cases seems blithe. First, the procedure is costly and cumbersome. Second, individuals unconnected with the

_____

1. See D. Del. R. Civ. P. 5.4(a) (providing that discovery materials "shall not be filed with the Court"); D.N.J. R. Civ. P. 26.1(c)(1) (same); E.D. Pa. R. Civ. P. 26.1(a) (same); M.D. Pa. R. Civ. P. 5.4(b) (same); W.D. Pa. R. Civ. P. 5.3(A) (same).

24

litigation, other than the media, will generally not know of it or will be unmotivated to bear the cost and burden of pursuing the filing of such material.

More importantly, Stinson's definition appears to me to encompass a much broader category of "disclosures" than what Congress intended to include within that term. Cf. United States v. Bank of Farmington, 166 F.3d 853, 861-62 (7th Cir. 1999) ("[W]e reject the construction . . . according to which there is public disclosure if the allegations are disclosed to any single member of the public not previously informed thereof." (internal quotations and brackets omitted)); Stinson, 944 F.2d at 1169 (Scirica, J., dissenting) ("I do not believe Congress intended to bar relators who obtain non-public information simply because that information might become public at a later time.").

Congress's primary intent in enacting the 1986 FCA amendments was "to enhance the Government's ability to recover losses sustained as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5266. As for the qui tam provisions of the FCA amendments, Congress's "overall intent" was "to encourage more private enforcement suits." Id. at 23-24, reprinted in 1986 U.S.C.C.A.N. at 5288-89. While avoiding parasitic lawsuits was clearly an additional goal, there is no indication that Congress sought to preclude the disclosure and prosecution of fraud when a prior, purely technical disclosure had been made. Rather, like Judge Scirica, "I can discern no reason why Congress would be concerned about information that has not yet been disclosed to the general public." Stinson, 944 F.2d at 1170 (Scirica, J., dissenting).

By precluding suits "based upon the public disclosure of allegations or transactions in" specific judicial, legislative, or administrative sources, or through the news media, Congress sought to ensure that no qui tam relator could profit from information that had become part of the public domain. Interpreting "public disclosure" to encompass information passed from one private litigant to another in the context of some obscure litigation may simplify our task of weeding out legitimate qui tam cases from parasitic ones (by effectively avoiding this sometimes difficult factual

25

question), but it fails to serve Congress's primary goals of encouraging disclosure and aiding prosecution of fraud on the government. There is no assurance that information about a fraud on the government, contained in privately disclosed discovery material (which will always constitute a "public disclosure" under Stinson), will either come to the government's attention or will lead to a private qui tam action. I agree with Judge Scirica's observation that "Congress drew the line at the point of actual public disclosure because it felt that this rule would bring the most fraud to light without engendering unnecessary suits." Id. at 1171 (Scirica, J., dissenting).

Although I think Stinson's reading of "public disclosure" is likely too broad and should be reconsidered by this court en banc, I also believe that materials obtained through a FOIA request are easily distinguishable from the discovery material deemed a public disclosure in Stinson. In contrast with Stinson, we recently held that a county government report filed with the federal government is not a public disclosure. See United States ex rel. Dunleavy v. County of Del., 123 F.3d 734, 745–46 (3d Cir. 1997). Distinguishing our holding in Stinson, we noted the danger of extending "Stinson's `potential availability' standard . . . to the context" of administrative reports. Id. at 746 n.14. I think that the reasoning behind Stinson and our decision in Dunleavy lead to the conclusion that the FOIA material at issue here is not a public disclosure.

First, it is clear that under Dunleavy, the simple fact that information subject to a FOIA request is potentially available to interested parties is insufficient to render it a "public disclosure." If this were the case, the information in Dunleavy, which the defendant had provided to a federal government agency, would have constituted a "public disclosure." More importantly, there is a clear distinction between discovery materials, which carry a "presumption . . . of public access," and the information contained in a FOIA request, which is provided to a single requester who is under no obligation to disclose this material to any other members of the public. This distinction can be seen by comparing the rules governing discovery with the statutory and regulatory provisions governing Mistick's FOIA request.

26

Local court rules often provide that while discovery material should not be filed with the court, see supra note 1, such material may under certain circumstances befiled. In this circuit, each U.S. district court also has rules governing filing and access to discovery materials.2 In Stinson, the qui tam claimant argued that discovery material was not a "public disclosure" precisely because it need not be filed with the court. See Stinson, 944 F.2d at 1158. As noted above, however, the panel rejected this argument, responding:

> We do not think that it is significant, for purposes of interpreting the "public disclosure" provision of the FCA, whether the discovery has in fact been filed. Due to the large volume of discovery materials, many district courts have adopted local rules which provide that discovery materials should not be filed with the court except by order of the court. Such local rules do not generally preclude access by interested persons to nonfiled material. In fact, the Local Rules of some district courts provide that the court may order the filing of discovery materials at the request of any person who has an interest in reviewing the materials.

Id. at 1158–59 (emphasis added) (footnote omitted). The panel reiterated this point in its conclusion: "To recapitulate, the presumption under Rule 5(d) of public access to civil discovery that is not subject to a protective order leads us to conclude that information received as a result of such discovery should be deemed based on a `public disclosure' for purposes of the FCA jurisdictional bar." Id. at 1159–60.

_____

2. See D. Del. R. Civ. P. 5.4(c)–(e) (providing for filing when necessary for use before, during, or after trial, or on motion of the court or any party, or "on application by a non-party"); D.N.J. R. Civ. P. 26.1(c)(1) (providing for filing of discovery materials "when needed in a particular pretrial proceeding or upon order of the Court"); E.D. Pa. R. Civ. P. 26.1(e) (providing for filing of discovery materials on motion of the court or of any party, "or on application by a non-party"); M.D. Pa. R. Civ. P. 5.4(c)–(e) (providing for filing of materials under certain circumstances); W.D. Pa. R. Civ. P. 5.3(E) (providing for filing of discovery materials "in the usual course in any case where any person shall file an affidavit with the clerk that he has a genuine interest in reading the material").

While I have taken issue with the conclusion that the Stinson majority drew from this potential availability of discovery materials, see supra at 24-25, it is clear that such material is far more publicly accessible than is the material obtained under a FOIA request. FOIA expressly provides that records furnished in response to a FOIA request are to be made "available for public inspection and copying" only when the relevant agency determines that, "because of the nature of their subject matter, .. . [the records] have become or are likely to become the subject of subsequent requests for substantially the same records." 5 U.S.C. S 552(a)(2)(D) (1994 & Supp. II 1996). Otherwise, such records are provided only to the individual FOIA requester. Further, nothing in FOIA would require the FOIA recipient to share the fruits of his request with other members of the public.

Although S 552(a)(2)(D) was added in 1996, 3 after Mistick made its FOIA request, nothing in FOIA at the time of Mistick's request would have required HUD (or Mistick) to make the materials provided through the request available to other members of the public. Additionally, in enacting the 1996 amendment, Congress did not intend to make most materials disclosed through a FOIA request presumptively accessible to the general public, but was only ensuring broad access to "previously-released records on a popular topic, such as the assassinations of public figures." H.R. Rep. No. 104-795, at 21 (1996), reprinted in 1996 U.S.C.C.A.N. 3448, 3464. In fact, since enactment of S 552(a)(2)(D), HUD has not amended its own regulations governing FOIA requests, as it apparently does not anticipate fulfilling very many FOIA requests that are likely to become the subject of subsequent, substantially similar requests. See 24 C.F.R. S 15.12(a)(1)-(3) (1998) (providing that HUD will make available for public inspection and copying three of the four categories of material included in 5 U.S.C. S 552(a)(2), failing to include material listed in S 552(a)(2)(D)).

Therefore, unlike most discovery material, no member of

_____

3. See Electronic Freedom of Information Act Amendments of 1996, Pub. L. No. 104-231, S 4(5), 110 Stat. 3048, 3049.

the public has a right of access to information that another person obtained through a FOIA request--nor can anyone seek an order compelling a FOIA recipient himself to "publicly disclose" material obtained through his FOIA request. Of course, other members of the public may themselves file a FOIA request seeking the same information, but this does not depend on, nor change the nature of, the material released through the prior FOIA request by a single citizen. And of course the information remains in the government's files, but under Dunleavy, this is insufficient to turn these records into a "public disclosure." See Dunleavy, 123 F.3d at 746.

In Dunleavy, we held that the list of enumerated sources in S 3730(e)(4)(A) "constitutes an exhaustive rendition of the possible sources" of a public disclosure. Id. at 744. The only enumerated sources that could be apposite here are an "administrative . . . report" or an "administrative . . . investigation." The majority concludes that an agency's act of fulfilling a FOIA request satisfies this source requirement, as both an administrative report and an administrative investigation. I think that this conclusion also is incorrect. FOIA requires federal agencies to search their records "for the purpose of locating those records which are responsive to a request." 5 U.S.C.S 552(a)(3)(D) (1994 & Supp. II 1996). It does not compel an agency to "investigate" a request, in the sense that an agency of the federal government normally investigates such things as allegations of fraud, crimes, or other wrongdoing. Rather, the Act simply forces agencies to "make [their] records promptly available," upon request. Id. S 552(a)(3)(A); see also 24 C.F.R. S 15.14(g)(2) (1998) (under HUD regulation governing costs of FOIA requests, "search" is defined as "time spent looking for material that is responsive to a request"). The Act is essentially a mechanism for duplicating records that are in the possession of the federal government and that are not otherwise excludable from members of the public. Thus, there is no "administrative . . . investigation."

Further, the duplication can hardly be described as an "administrative . . . report." There is no analysis, summary, conclusion, or other content to "report" to the FOIA

29

requester. Rather, the actual records themselves, with possible redactions, are merely duplicated and provided to the FOIA requester. See 5 U.S.C. S 552(a)(4)(A) (1994); see also 24 C.F.R. S 15.14(a) (1998) (listing fees for HUD's fulfilling of FOIA requests through the "reproduction or duplication of documents"). Again, I believe that the majority strains to read the phrases "investigation" and "report" to encompass a government agency's rudimentary act of locating and duplicating requested records. Under this analysis, the methodological requirements for establishing the jurisdictional bar are not met.

We held in Dunleavy that public disclosures bar a qui tam action only if the disclosures include both the misrepresented state of facts and the true state of facts. See Dunleavy, 123 F.3d at 741. The majority concludes that the misrepresented state of facts (i.e., that the defendants did not know of the problem with Glid Wall until 1990) was disclosed in the FOIA material and that the true state of facts (i.e., that the defendants knew of the Glid Wall problem as early as 1987) was revealed in the state-court action, meeting the requirements for a public disclosure. Although I am constrained to agree with the majority's conclusion that (under our holding in Stinson) the discovery material in this case constitutes a public disclosure, because I would find that the FOIA material--the source of the misrepresented facts--is not a public disclosure, I would hold that Mistick's claim is not jurisdictionally barred.

II. "Based Upon"

Although my view of the FOIA materials would, in and of itself, require reversal of the District Court's dismissal of Mistick's claim, I address the "based upon" issue, as it is a critical issue, and one on which I believe the majority has reached a manifestly incorrect conclusion. Courts have differed on the proper interpretation of this phrase. Compare, e.g., United States ex rel. Findley v. FPC-Boron Employees' Club, 105 F.3d 675, 682-85 (D.C. Cir.) (holding that a qui tam action is based upon public disclosures if it relies on the same allegations or transactions as those in the public disclosure), cert. denied, 118 S. Ct. 172 (1997),

30

with United States ex rel. Siller v. Becton Dickinson & Co., 21 F.3d 1339, 1347-49 (4th Cir. 1994) (holding that a qui tam action is based upon public disclosures only if it "actually derived [its] allegations" from the public disclosures). So have commentators. ARTICLES FOOTNOTECompare Robert Salcido, Screening Out Unworthy Whistleblower Actions, 24 Pub. Cont. L.J. 237, 272-79 (1995) (advocating broad view of "based upon"), with Gary W. Thompson, A Critical Analysis of Restrictive Interpretations Under the False Claim Act's Public Disclosure Bar, 27 Pub. Cont. L.J. 669, 697-705 (1998) (advocating plain reading of "based upon"), and Robert L. Vogel, The Public Disclosure Bar Against Qui Tam Suits, 24 Pub. Cont. L.J. 477, 499-501 (1995) (same).

In view of this literature, I will not describe the debate at length here. I will, however, explain why I find more persuasive the view that a qui tam plaintiff is barred from bringing his claim only when he has derived his information regarding the allegations or transactions underlying his cause of action from public disclosures.

A. The Contending Views of "Based Upon"

The first court of appeals to adopt a plain reading of "based upon" was the Fourth Circuit, in an opinion by Judge Luttig. The court noted that the "reading of `based upon' as meaning `derived from' is the only fair construction of the statutory phrase." Siller, 21 F.3d at 1348. It therefore held that "a relator's action is `based upon' a public disclosure of allegations only where the relator has actually derived from that disclosure the allegations upon which his qui tam action is based." Id. The court also noted that its reading was not only the most logical reading of the statute's plain text, but also effectuated Congress's goal of precluding "parasitic" suits by non-whistleblowers attempting to take advantage of public disclosures: "[I]t is self-evident that a suit that includes allegations that happen to be similar (even identical) to those already publicly disclosed, but[that] were not actually derived from those public disclosures, simply is not, in any sense, parasitic." Id.

31

The contrasting view is explicated in Judge Wald's decision for the D.C. Circuit in Findley. In addition to claiming that the Fourth Circuit's interpretation of "based upon" rendered the "original source" exception superfluous, the court in Findley considered the legislative history of the FCA. See Findley, 105 F.3d at 683–84. It expressed its belief that Congress, in the 1986 amendments, "changed the focus of the jurisdictional bar from evidence of fraud inside the government's overcrowded file cabinets to fraud already exposed in the public domain." Id. at 684.

The majority today agrees with Findley's reading of "based upon" and rejects Siller's plain reading of the jurisdictional bar. It cites two justifications for doing so: (1) because Congress was sloppy in choosing the language of the jurisdictional bar, we should not give this text its plain meaning, and (2) the plain reading of "based upon" renders the "original source" exception superfluous. See Maj. Op. at 15–16. I take up each of these contentions below, after a discussion of the Act's plain meaning. I conclude by considering whether the plain reading of the text adequately fulfills Congress's goals in the 1986 amendments.

B. The Plain Meaning of "Based Upon"

The Supreme Court has repeatedly explained that recourse to legislative history or underlying legislative intent is unnecessary when a statute's text is clear and does not lead to an absurd result. See, e.g., Darby v. Cisneros, 509 U.S. 137, 147 (1993) ("Recourse to the legislative history of [a provision of the APA] is unnecessary in light of the plain meaning of the statutory text."); see also Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 37 (1998) ("The language is straightforward, and with a straightforward application ready to hand, statutory interpretation has no business getting metaphysical."); Rubin v. United States, 449 U.S. 424, 429–30 (1981) ("We begin by looking to the language of the Act. . . . When we find the terms of a statute unambiguous, judicial inquiry is complete, except in rare and exceptional circumstances." (internal quotations omitted)). The Court has instructed us to begin with a statute's text when

32

discerning its meaning, and to "assume that the legislative purpose is expressed by the ordinary meaning of the words used." United States v. James, 478 U.S. 597, 604 (1986) (internal quotation omitted).

As the Fourth Circuit said in Siller, "Section 3730(e)(4)(A)'s use of the phrase `based upon' is. . . susceptible of a straightforward textual exegesis. To `base upon' means to `use as a basis for.' " 21 F.3d at 1348 (quoting Webster's Third New International Dictionary 180 (1986)). I agree with this plain reading of the phrase "based upon" and further concur with Siller's conclusion that there is no usage, "let alone a common one or a dictionary definition, that suggests that `based upon' can mean `supported by.' " Id. at 1349.

Other federal statutes and case law support my plain reading of the phrase "based upon." For example, an exception to the Foreign Sovereign Immunities Act of 1976 allows a plaintiff to bring suit against a foreign government in any case "in which the action is based upon a commercial activity carried on . . . by the foreign state." 28 U.S.C. S 1605(a)(2) (1994). In Saudi Arabia v. Nelson, 507 U.S. 349 (1993), the plaintiff had allegedly been tortured and beaten by Saudi Arabian law enforcement officers in retaliation for his complaints about safety problems at a Saudi hospital at which he worked. See id. at 352–53. He brought an action against the Saudi government, contending that his claim was "based upon a commercial activity" of that government because he was recruited to work at its hospital, signed an employment contract with the government to work at the hospital, and was actually employed by the government to work there.

In determining whether the action was "based upon a commercial activity," the Supreme Court first noted:

> Although the Act contains no definition of the phrase "based upon," and the relatively sparse legislative history offers no assistance, guidance is hardly necessary. In denoting conduct that forms the `basis,' or `foundation,' for a claim, the phrase is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case.

33

Id. at 357 (citing Black's Law Dictionary, Random House Dictionary, and Webster's Third New International Dictionary). The Court then held that, "where a claim rests entirely upon activities sovereign in character, . .. jurisdiction will not exist under that clause regardless of any connection the sovereign acts may have with commercial activity." Id. at 358 n.4. Because the recruitment, contract signing, and employment at the hospital, all admittedly commercial in character,"[were] not the basis for the Nelsons' suit," the action was not based upon a commercial activity of the foreign government. Id. at 358; see also id. at 364 (White, J., concurring in judgment) (agreeing with the majority that the recruiting and hiring of the plaintiff was " `not the basis for the Nelsons' suit,' for it is unrelated to the elements of [their] complaint" (citation omitted)).

The commercial activities may have provided the background for the complaint and have had a "connection" to the sovereign acts that the claim was based upon, but the action was not derived from these commercial activities; rather, the action was derived from the tortious acts of foreign government officials. Therefore, it was not "based upon" commercial activities of the foreign government.

Similarly, in the FCA context, I believe that "guidance is hardly necessary." While public disclosures will typically have some connection to the allegations in a relator's complaint, in the sense that the disclosures and the allegations in the complaint are similar, the latter cannot be said to be "based upon" the former when the complaint "rests upon" allegations contained in some other (non-publicly disclosed) source.

Judicial use of the words "based upon" also supports my reading of this simple phrase. For example, in the context of the "independent source" exception to the exclusionary rule, evidence is not excluded if it is derived from some source other than the tainted search or identification. The Supreme Court has described the government's burden in such a situation as proving that evidence introduced at trial was "based upon" some source other than the illegal one, or that "the evidence to which instant objection is made has [not] been come at by exploitation of that illegality [but]

34

instead by means sufficiently distinguishable to be purged of the primary taint." United States v. Wade , 388 U.S. 218, 241 (1967) (internal quotation omitted). The Court's use of the phrase "based upon" in Wade, to mean "come at by exploitation of," is consistent with my plain reading of "based upon" in the FCA. If a qui tam action exists only by exploitation of publicly disclosed allegations or transactions, it falls within the jurisdictional bar. If, on the other hand, knowledge of the allegations or transactions at the heart of a qui tam claim was obtained through"means sufficiently distinguishable to be purged of the primary taint" of the public disclosures, the bar should not apply.4

In the present case, the majority finds that a qui tam action that relies on information that is similar to that which has been publicly disclosed is ineluctably"based upon" the public disclosures, even though the qui tam relator has not "come at [this information] by exploitation of " the public disclosures, or "substantially copied" its information from the public disclosures. I find that this reading flies in the face of the plain meaning of"based upon," as indicated by its usage in common parlance, in other statutes, and in judicial opinions. It is noteworthy that the majority does not take issue with this plain meaning discussion. Indeed, it implicitly concedes its efficacy, though not its overwhelming force. I now turn to the majority's efforts to blunt the pellucid text of the FCA by reference to Congress's sloppy drafting and the alleged undermining of the "original source" exception by this plain reading of the statute. I then examine the purpose and policy undergirding the qui tam statute, which inform the varying interpretations of "based upon." But on the basis of the plain meaning alone, I would find that the jurisdictional

_____

4. My plain reading of "based upon" finds support in still other fields. For
example, under copyright law, a "derivative" work is defined as one that is "based upon one or more preexisting works," 17 U.S.C. S 101 (1994), a definition that has been read as requiring that the derivative work be "substantially copied from a prior work." 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright S 3.01, at 3-3 (1997) (emphasis omitted). In other words, if the latter work is similar to the preexisting one, but is
not copied substantially therefrom, it is not "based upon" that preexisting work.

35

bar does not apply to a qui tam claim that is not derived from public disclosures.

C. Congress's Sloppy Drafting

The majority claims that we may ignore the plain meaning of S 3730(e)(4)(A) because it "does not reflect careful drafting or a precise use of language." Maj. Op. at 18.5 The majority lists a number of minor drafting problems in support of its argument. For example, it notes the mistaken identification of the General Accounting Office (or "GAO") as the "Government Accounting Office,"6 the use of the phrase "hearing" when the broader concept of "trial" was clearly intended, and the preclusion of jurisdiction over qui tam "actions," when such actions may contain many "claims," some of which are "based upon" public disclosures and others which are not. The majority's reliance on Congress's alleged sloppiness appears to be a different way of saying that "the language of the statute is ambiguous," thereby giving us license to "consider the structure and context of the ambiguous language," Findley, 105 F.3d at 683, rather than giving it its plain meaning.

_____

5. This is hardly a new phenomenon. Congress regularly lapses into sloppy drafting, as has been frequently noted by courts. See, e.g., H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 249 (1989) ("RICO may be a poorly drafted statute; but rewriting it is a job for Congress, if it is
so inclined, and not for this Court."); Lansford-Coaldale Joint Water Auth.
v. Tonolli Corp., 4 F.3d 1209, 1221 (3d Cir. 1993) (noting that CERCLA is "notorious for its lack of clarity and poor draftsmanship"); Cvikich v. Railroad Retirement Bd., 860 F.2d 103, 104 (3d Cir. 1988) (giving a provision of the Railroad Retirement Act its plain meaning, despite its "poor draftsmanship"). Yet we interpret these poorly drafted statutes as best we can, and "assume that in drafting legislation, Congress says what it means." Sundance Assocs., Inc. v. Reno, 139 F.3d 804, 809 (10th Cir. 1998).

6. The drafter who made this error was likely confused by the appellations of the Government Printing Office, which publishes government reports, and the General Accounting Office, which performs government audits. I note that both reports and audits of the "Government Accounting Office" are listed as public disclosures in S 3730(e)(4)(A).

36

I find this argument unpersuasive because, whether or not Congress was sloppy in its choice of certain words, there is nothing ambiguous about the phrase "based upon," and its interpretation requires no "fine parsing of the syntax of S 3730(e)(4)(A)." Maj. Op. at 19. As for the majority's examples of Congress's sloppiness, it certainly was reasonable for Congress to use the general phrase, "criminal, civil, or administrative hearing," if it intended to include under this aegis criminal or civil trials. Its choice of words could easily reflect not imprecise drafting, but an attempt to broadly encompass criminal, civil, or administrative proceedings, without listing every possibility, such as criminal pre-trial hearings, criminal trials, sentencing hearings, civil discovery proceedings, civil trials, appellate hearings, administrative hearings, etc.

The majority gives no indication of the origin of the GAO mistake, and it is possible that it was simply a transcribing problem or a mistake by a single staff person that escaped detection. Courts have frequently referred to the General Accounting Office as the Government Accounting Office, a reasonable mistake on which I believe the majority places more emphasis than it deserves. See, e.g., Adams v. Hinchman, 154 F.3d 420, 421 (D.C. Cir. 1998) (referring to the "Government Accounting Office" in a Fair Labor Standards Act case brought by federal employees), cert. denied, 119 S. Ct. 2046 (1999); Dunleavy, 123 F.3d at 745 ("We take notice of the fact that Congress and the Government Accounting Office are entities of our federal government.").

In addition, Congress has previously made the same mistake, and corrected it when its error was discovered. Compare Resolution Trust Corporation Refinancing, Restructuring, and Improvement Act of 1991, Pub. L. No. 102-233, S 106(d), 105 Stat. 1761, 1764 (adding new subsection (k)(11)(B) to 12 U.S.C. S 1441a, requiring the Resolution Trust Corporation to report to certain congressional committees "[t]he total number of individuals performing services for the Corporation as an employee of . . . the Government Accounting Office"), with Housing and Community Development Act of 1992, Pub. L. No. 102-550, S 1611(d)(3)(B), 106 Stat. 3672, 4091 (amending

37

S 1441a(k)(11)(B), to replace "Government Accounting Office" with "General Accounting Office").7 The majority cannot be suggesting that courts should have ignored the plain meaning of the entire Resolution Trust Corporation Refinancing, Restructuring, and Improvement Act of 1991, simply because of the misidentification of the GAO in one part of that enactment.

Finally, as with its misnaming of the GAO, Congress's use of a broad term such as "action" (or "case") when the more limited "claim" might be more appropriate is far from unprecedented. See, e.g., Wisconsin Dep't of Corrections v. Schacht, 118 S. Ct. 2047, 2054 (1998) ("Conceivably, one might also read [28 U.S.C. S 1447(c)'s] reference to `case,' to include a claim within a case as well as the entire case."). As noted supra note 5, however, our ultimate task is to effectuate Congress's intent, as demonstrated first and foremost by the language it has employed, even if that language is less than precise.

Most importantly, as I discuss infra Part II.E, even if the language of the FCA is imprecise or ambiguous, thereby justifying resort to legislative intent, Congress's intent is better effectuated by the narrow reading of "based upon." Suffice it to say here that I find unavailing the majority's attempt to avoid the plain meaning of this phrase on the ground that Congress was being sloppy at the time it codified the relevant statutory provision.

D. Does a Plain Reading of "Based Upon" Render the "Original Source" Exception Meaningless?

The majority adopts the view of the D.C. Circuit that the plain reading of "based upon" renders the"original source" exception superfluous, a result we should try to avoid. See

_____

7. Apparently, the leading newspapers in our nation's capital are also not immune to the problem of misnaming the GAO. A search of the relevant Westlaw databases produced 128 articles from the Washington Post over the past fifteen years in which the GAO was mistakenly identified as the "Government Accounting Office," and 48 articles from the Washington Times over the past nine years in which the same mistake was made. On the other hand, the papers correctly identified the GAO thousands of times during these periods.

38

Maj. Op. at 15–16. In Findley, Judge Wald posited an example of a relator who "independently" investigated a fraud after reading about it in the Washington Post or Washington Times in order to qualify as an original source despite the fact that the hypothetical relator's claim was derived from a public disclosure. See Findley, 105 F.3d at 683. It is clear, however, that the present relator, Mistick, is nothing like the opportunistic and parasitic relator conjured up by Judge Wald. Rather, Mistick plausibly alleges (but has not had the opportunity to prove) that it learned of defendants' fraud well before it was "publicly disclosed" in state-court litigation (not in a widely circulated newspaper). Thus, Judge Wald's bellwether example is so extreme as to undermine her position.

Under the plain reading of "based upon," it is true that a relator whose claim is derived entirely from public disclosures cannot be an original source because the entire claim is "dependent" on the public disclosures, and a fortiori the relator does not have "independent" knowledge of any elements of his claim. While it is entirely possible that Congress, in enacting the complex and overlapping amendments to the FCA in 1986, failed to foresee that its new "based upon" language could render the"original source" exception superfluous, this provides scant basis for our failing to give effect to plain congressional language. Ironically, the majority implies that the same Congress whose sloppy drafting it invokes to justify ignoring the FCA's plain meaning would have been careful (or sufficiently astute) to avoid enacting an original source exception that has subtle, and perhaps unintended, interactions with the jurisdictional bar in S 3730(e)(4)(A). But even under the plain reading of "based upon," I believe that there are at least two situations in which the original source exception will assist a relator whose claim is (or appears to be) derived from public disclosures.

First, in Stinson, the majority observed that, "[u]ndoubtedly, it is not necessary for a relator to have all the relevant information in order to qualify as `independent.' " Stinson, 944 F.2d at 1160; see also United States ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 657 (D.C. Cir. 1994) (holding that a relator, to be an

original source, need have "direct and independent knowledge of any essential element of the underlying fraud transaction"). Just as the Stinson majority assumed that an original source need not have independent knowledge of all elements of his claim, it is possible that a qui tam claim need not be derived entirely from public disclosures to fall under the "based upon" jurisdictional bar, as long as some essential element of the qui tam claim is derived from public disclosures. A number of courts have so held, though I take no position here on this complex question. See, e.g., Farmington, 166 F.3d at 863 (holding that a claim is "based upon" a public disclosure "[i]f the public disclosure from which the information is actually derived is essential to a qui tam claim"); cf. United States ex rel. Precision Co. v. Koch Indus., 971 F.2d 548, 552 (10th Cir. 1992) (holding that "an FCA qui tam action even partly based upon publicly disclosed allegations or transactions is nonetheless `based upon' such allegations or transactions"). Under this view, a relator who is barred because he has derived some of his fraud information from a public disclosure may still bring the claim as an original source if he has direct and independent knowledge of some other essential element of the claim.

Second, my view of "based upon" would admittedly require a factual inquiry into the basis of a qui tam relator's allegations. Whenever there were public disclosures revealing both the true and the misrepresented facts, a defendant would no doubt claim that the relator derived his information from these disclosures. In response, it may be easier for the relator to establish himself as an "original source" of the information than to successfully disprove a causal link between the public disclosures and his qui tam claim. The original source exception would sometimes be invoked by a relator with a claim that is not technically derived from public disclosures, but that is difficult to separate from those disclosures. This would be particularly true in the case of widely publicized disclosures, such as those in Judge Wald's example. If the relator in her example had prior direct knowledge of the fraud allegations revealed in the newspaper articles, but failed to file suit until after the articles appeared (a scenario quite similar to Mistick's), it may well be easier for that relator to simply

40

identify its prior "original source" of the information than to prove that its qui tam action is not causally linked with the very public disclosures.

The majority has sought to discredit the foregoing analysis. The majority's response inevitably has some force, but that is so because minor, unintended consequences may result from our effectuating the plain meaning and evident intent of a complex federal statute. But only my reading of the jurisdictional bar gives effect to (and fulfills Congress's intent regarding) both the "based upon" language and the "original source" exception, without ignoring the plain meaning of either phrase. The intent of the "original source" exception is to allow one who contributes valuable, first-hand information regarding a fraud on the government to bring a qui tam action whether or not that information (or possibly other information related to the fraud) was publicly disclosed, and whether or not that relator can prove that his claim is not derived from these disclosures. The "based upon" requirement is intended to foreclose parasitic qui tam suits that derive their claim from publicly disclosed information. Taken together, these two requirements will bar actions by relators who piggyback on public disclosures and cannot demonstrate that they have contributed any useful (i.e., independent and direct) information regarding a fraud on the government.

E. Purpose of Qui Tam Actions

1. Legislative Intent

Even if I were to ignore the plain meaning of the FCA and to instead look to Congress's alleged intent in amending the statute in 1986, I believe that my reading of "based upon" more fully effectuates all of Congress's goals. Congress had three primary aims in enacting the 1986 amendments: (1) encouraging those with information regarding frauds on the government to disclose this information; (2) discouraging parasitic qui tam actions that simply take advantage of information already in the public domain; and (3) assisting --and prodding--the government to act upon information

41

that it had been (or is being) defrauded. See S. Rep. No. 99-345, at 1-8, 23-24 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5266-73, 5288-89; cf. Thompson, supra, at 693 ("Congress not only wanted to expose fraud but also wanted to encourage the use of nongovernmental resources to activate and advance qui tam cases to prosecution."). My interpretation of "based upon" effectuates all three of these goals, while the view adopted by the majority in this case will in many situations only advance the first goal.

Initially, I note that it is only the hair-trigger invocation of the jurisdictional bar, created by our precedent in Stinson, that renders the strained interpretation of "based upon" even arguably necessary. Under Stinson , the phrase "public disclosure" is something of a misnomer. While it may conjure up images of a widely disseminated piece of information or something divulged at a press conference, it includes information revealed to a small number of persons, such as evidence disclosed to a single litigant through unfiled state-court discovery (or, under the majority's holding today, information obtained from a single FOIA request). See supra Part I. Therefore, a "public disclosure" will exist in a great number of qui tam cases, foreclosing all actions "based upon" these disclosures if not brought by an original source.

In the paradigmatic whistleblower case, the varying interpretations of "based upon" will usually lead to the same result. When a public disclosure is widely disseminated, such as through a filing in a highly publicized legal case or in a press conference by a whistleblower or the government agency involved, the information regarding the fraud will have been brought forth, anyone who is not an original source will almost certainly be prevented from demonstrating that their claim was not derived from the highly publicized public disclosure, and the government will be hard pressed to sit on the information that it was defrauded, given the publicity.

However, in the case of a "public disclosure" in legal construct only, the different interpretations of"based upon" will lead to varying results, and, I contend, the plain reading of "based upon" will most fully effectuate all of the

42

goals Congress sought to advance in the 1986 amendments. The argument that a broad reading of "based upon" most fully effectuates Congress's intent to preclude parasitic suits "ignores the reality that the term `public disclosures' encompasses disclosures that receive all different degrees of publicity, reaching audiences ranging from one person to millions of people." Vogel, supra, at 513.

When allegations have been "publicly disclosed" under Stinson's broad interpretation of this phrase, but have been revealed to few people, rather than "millions of people," the purpose of the FCA is best fulfilled by encouraging those who discover the information through some other source to bring suit. This can be seen from our decision in Stinson, and in the majority's holding today that information obtained through a FOIA request is a "public disclosure." In both cases, if the narrow group of individuals (as few as one) who are privy to these "disclosures" decide to keep them secret, at least two purposes of the FCA--encouraging the disclosure of fraud, and prodding and/or assisting the government in prosecuting this fraud--will be furthered only if another individual who discovers the fraud through some other means is allowed to bring a qui tam action.

2. Legislative History

While disclaiming reliance on legislative history, see Maj. Op. at 19 n.9, the majority cites two statements by FCA sponsors in support of its argument. However, as this court has previously noted, statements can easily be found pointing in opposite directions when it comes to the FCA's legislative history. See Stinson, 944 F.2d at 1154 ("The bill that eventuated in the 1986 amendments underwent substantial revisions during its legislative path. This provides ample opportunity to search the legislative history and find some support somewhere for almost any construction of the many ambiguous terms in the final version.").

The D.C. Circuit in Findley purported to rely more extensively on legislative history, arguing that, in changing the jurisdictional bar of the FCA from claims "based upon evidence or information in the possession of the United

States" to those "based upon the public disclosure of allegations or transactions," Congress altered the focus of the bar from information in the government's possession to "fraud already exposed in the public domain." Findley, 105 F.3d at 684. More precisely, however, what Congress intended was to change the focus from information in the government's possession to information that is sufficiently publicly disclosed to bring the fraud to the government's attention and to spur it into acting upon the information.

If Congress had the intent claimed by the Findley court, it could simply have substituted in the jurisdictional bar the phrase "information that has been publicly disclosed" for "information in the possession of the United States." The statute would then have read, in relevant part,"No court shall have jurisdiction over an action under this section based upon evidence or information that has been publicly disclosed in a criminal, civil, or administrative hearing, [etc.] . . . ." Instead, Congress completely changed the focus of the key phrase "based upon," eliminating a structure in which the phrase referred to "evidence or information," and creating one in which it referred to "public disclosure of allegations or transactions." The actual statute now reads, "No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, [etc.] . . . ."

There is a fundamental difference between a claim that is based upon certain information that has been publicly disclosed, and a claim that is based upon certain enumerated public disclosures. This difference evinces an intent to focus not broadly on information in the public domain, but narrowly on the specific public disclosures that contain the information. The Findley court interpreted "based upon" as if Congress chose to make the former change--precluding suits based upon certain information-- rather than the change it actually made, in which"based upon" refers to certain disclosures. While this change in focus is not conclusive in and of itself, I believe the D.C. Circuit's misreading of this substantial change undercuts its argument regarding Congress's intent.

44

F. Summary

In sum, I do not believe we can escape the plain meaning of the phrase "based upon" in the FCA's jurisdictional bar. There is no justification for giving this phrase a convoluted reading that not only ignores its plain meaning, but that also extends Stinson's error of interpreting the jurisdictional bar so as to foreclose virtually all qui tam suits that do not fit within the mold of the paradigmatic insider/whistleblower case. The plain meaning most effectively fulfills Congress's intent, and does so without ignoring or rendering meaningless any portion of the 1986 amendments.

III. Disposition of Mistick's Qui Tam Suit

As I disagree with the majority's conclusion that the material obtained through Mistick's FOIA request was a public disclosure, I would find that the misrepresented state of facts underlying its qui tam claim had not been publicly disclosed. Therefore, under our holding in Dunleavy that the jurisdictional bar does not apply unless both the true and the misrepresented facts have been publicly disclosed through one of the enumerated sources, Mistick's qui tam claim is not jurisdictionally barred.

But even if the FOIA material were to constitute a public disclosure, Mistick's qui tam action may not be"based upon" public disclosures because it claims that it learned of the true state of facts not through the public disclosure in the state-court action, but earlier, through meetings with the maker of Glid Wall, and through its own independent investigations. Because it is ultimately a fact question whether Mistick's information underlying its qui tam action was derived from the public disclosures, and because the District Court did not reach this issue, I would remand for the District Court's determination of this issue in the first instance. Cf. Siller, 21 F.3d at 1349 (remanding for the district court to determine whether the allegations in a relator's action were derived from a public disclosure); Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 n.16 (3d Cir. 1977) ("[T]he district court is free to determine facts relevant to its jurisdiction . . . .").

45

IV. Conclusion

The policy consideration undergirding the restrictive view of qui tam litigation (and the expansive view of the jurisdictional bar) is that it is necessary to eliminate opportunistic and parasitic lawsuits. I share the view that such suits are an abomination. I believe, however, that Stinson, Findley, and their progeny (including the majority opinion here) cut such a broad swath that they eviscerate bona fide suits, such as the one at bar, in a laudable but misguided effort to halt a feared torrent of litigation.

In my view, the recent amendments to the False Claims Act were intended to encourage qui tam suits that do not derive their knowledge of an underlying fraud from truly public disclosures, and to encourage those with information about frauds on the government to inform the government about the fraud, assist the government in bringing legal action to bear against the defrauders, and, if necessary, prod the government into action. I see the majority opinion as inconsistent with this intent of Congress. More importantly, it is inconsistent with the plain language of the FCA. Because the majority's misreading affects the outcome of this case, I respectfully dissent.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

46