UNITED STATES ex rel. Robert A. HOCHMAN, Dr.; United States ex rel. Susan Deschenes, Dr., Plaintiffs–Appellants,

v.

Lee M. NACKMAN; Shri K. Mishra, Dr.; Byron V. Whitney; Mohamed N. Rashad, Dr.; Gary Anthone, Dr.; Steven Stain, Dr., Defendants–Appellees.

No. 96–56790.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 2, 1998.

Decided May 27, 1998.

**1070**

Robert Berke, Santa Monica, California, for plaintiffs-appellants.

Michael P. Stone and Marc Berger, Pasadena, California, for defendants-appellees.

Before: FLETCHER, MAGILL,* and T.G. NELSON, Circuit Judges.

MAGILL, Senior Circuit Judge:

Dr. Robert Hochman and Dr. Susan Deschenes, employees of the Los Angeles Veterans Administration Outpatient Medical Clinic (Clinic), brought this qui tam action under the False Claims Act, 31 U.S.C. §§ 3729–33 (1994), against Clinic administrators and

---

* Honorable Frank J. Magill, Senior United States Circuit Judge for the Eighth Circuit, sitting by

against physicians who were affiliated with both the Clinic and the University of Southern California School of Medicine (USCSM). Hochman and Deschenes alleged, *inter alia,* that the defendants submitted and approved inaccurate attendance records for Clinic physicians, thereby charging the government for time that the physicians did not spend at the Clinic. The district court granted summary judgment in the defendants' favor, and Hochman and Deschenes now appeal. We hold that the False Claims Act's statutory bar to claims based on publicly disclosed information did not prevent the district court from exercising jurisdiction over this case. Because the qui tam plaintiffs failed to present evidence upon which a reasonable factfinder could conclude that the defendants knowingly presented false claims, we affirm the district court's grant of summary judgment to the defendants. We also hold that the district court did not abuse its discretion in denying the plaintiffs' motion to recuse.

**I.**

The Clinic is the largest freestanding ambulatory care facility in the Veterans Health Administration (VHA) system. Its purpose is "to deliver efficient, competitive, quality care" complemented by "patient-centered education and research." U.S. Dep't of Veterans Affairs, *VA Outpatient Clinic: L.A.* at 3 (1996).

In 1987, the Clinic entered into an affiliation agreement with USCSM "for the purpose of research, education and training." Memorandum of Affiliation Between the Veterans Admin. Outpatient Clinic L.A. and the Univ. of S. Cal. at 1 (Dec. 24, 1987) (Affiliation Agreement). The Affiliation Agreement stated:

> The university accepts responsibility for the integrated education and training programs conducted with the VA [Veterans Administration] facility. The responsibility for cooperative research programs, will be shared jointly. The Veterans Administration retains full responsibility for the care of patients, including all administra-

designation.

tive and professional functions pertaining thereto.

*Id.*[1] The Affiliation Agreement also provided that the Clinic's full-time and part-time staff members "[w]ill participate in the education and training programs within their respective services." *Id.* at 3.

Medical schools and VHA facilities have entered into similar affiliations ever since the end of World War II. Currently, there are approximately 120 medical school affiliations with VHA institutions, and over half of the nation's physicians have received a portion of their training at VHA medical facilities.

In 1992, the Department of Veterans Affairs Inspector General (IG) investigated a confidential informant's allegations of misconduct at the Clinic, including the allegation now raised by Hochman and Deschenes that certain doctors were paid for time that they did not spend at the Clinic. In March 1994, the IG issued a final report of the investigation. The report concluded that the allegations could not be substantiated and that further action against the Clinic physicians and administrators was not justified.

On July 25, 1994, Hochman and Deschenes, both full-time Clinic surgeons who had no affiliation with USCSM, filed suit under the False Claims Act against a number of defendants.[2] The named defendants included the Clinic's director, Lee Nackman. As the director, Nackman served as a liaison between the Clinic and the VHA. Nackman also authorized the creation of new positions at the Clinic and approved recommendations to appoint chiefs of specialized practice areas.

Hochman and Deschenes also named as a defendant Dr. Shri Mishra, who taught clinical neurology at USCSM and served as the Clinic's chief of staff. Mishra was responsible for supervising the clinical staff and the chiefs of specialized practice areas. Defendant Dr. Mohamed Rashad held a teaching position at USCSM and served as the Clinic's chief of anesthesiology. Defendant Dr. By-

ron Whitney, the Clinic's chief of surgery, was responsible for overseeing physicians working in surgery. Defendants Dr. Gary Anthone and Dr. Steven Stain were assistant professors of surgery at USCSM and part-time surgeons at the Clinic.

Hochman and Deschenes sought to hold the defendants liable for four types of alleged misconduct, the details of which are set forth more fully in the analysis below. They first contended that the defendants erroneously authorized bonus pay for anesthesiologist Rashad. Second, they contended that the defendants created jobs and hired physicians that the Clinic allegedly did not need. Third, they contended that the defendants' method of compensating residents effectively paid residents who no longer worked at the Clinic. Finally, they contended that certain physicians and residents were overpaid because their attendance records stated that they were at work when they were not present at the Clinic.

On July 31, 1996, the defendants filed a motion for summary judgment. The district court first held that the bar under 31 U.S.C. § 3730(e)(4) against claims based on publicly disclosed information did not prevent the district court from hearing this case. The district court then held that the plaintiffs did not present evidence showing that any of the defendants had knowingly submitted false or fraudulent claims. The district court granted the defendants' summary judgment motion on August 30, 1996.

One week after the district court formally granted the motion, the plaintiffs, who learned that the district judge was a graduate of USC's law school, requested that the district judge disclose his affiliation with USC. On October 24, 1996, the district judge disclosed that he had graduated from USC's law school, that he was a member of Legion Lex, the law school's alumni association, and that he contributed $250 annually to Legion

---

1. The Veterans Administration is now known as the Department of Veterans Affairs. This opinion refers to both as the VA.

2. Pursuant to the procedural restrictions on private False Claims Act actions, the federal govern-

ment reviewed the complaint but declined to intervene, leaving Hochman and Deschenes to pursue their claims as qui tam relators. *See* 31 U.S.C. § 3730(b)(4)(B) (1994).

Lex. The district judge found no basis for recusing himself on these grounds.

Hochman and Deschenes now appeal, raising three issues: whether the district court properly exercised jurisdiction over this claim; whether the district court properly granted summary judgment to the defendants; and whether the district court abused its discretion in finding no grounds for recusal. We affirm.

## II.

We first address the defendants' contention that the district court lacked subject matter jurisdiction over this case because the suit was based on publicly disclosed information. The False Claims Act's "public disclosure" jurisdictional restriction prevents district courts from hearing private actions "based upon the public disclosure of allegations or transactions . . . in a congressional, administrative, or Government Accounting Office report, hearing, audit or investigation, or from the news media, unless . . . the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A) (1994). We review the exercise of jurisdiction de novo, and we accept the district court's factual findings on jurisdictional questions unless they are clearly erroneous. *United States v. Northrop Corp.,* 5 F.3d 407, 409 n. 5 (9th Cir.1993).

The defendants' public disclosure argument relies on the operation of the Inspector General Act, which requires IGs to provide Congress and agency heads with semiannual statements summarizing their investigations and recommendations, and allows, but does not require, IGs to provide summaries of reports that find no improper expenditures have been made. *See* Inspector General Act of 1978 § 5(a), (b), 5 U.S.C. app. § 5(a), (b) (1994). Because this Circuit has held that information contained in an IG's semiannual statement to Congress is publicly disclosed,

*see United States ex rel. Fine v. Chevron, U.S.A., Inc.,* 72 F.3d 740, 743 (9th Cir.1995) (en banc), the defendants assert that the allegations in the March 1994 report on the Clinic "had ostensibly been made public" by the IG's semiannual statement to Congress.[3] Resp'ts' Br. at 14.

We disagree. In *Fine,* the plaintiff conceded that the contents of the report at issue were detailed in the IG's publicly disclosed semiannual statement. *Fine,* 72 F.3d at 743. Here, the district court found that the IG's publicly disclosed semiannual statement did not contain the information gathered in the IG's March 1994 report. *See* Tr. of Proceedings at 6 (Aug. 27, 1996) ("There is no evidence to suggest that the contents of the investigation report prepared in March of 1994 by the Inspector General's office was actually included in that office's semi-annual report release[d] on April 30, 1994." (capitalization omitted)). Because the district court did not err in finding that the allegations in this case were not part of the IG's publicly disclosed statement, we hold § 3730(e)(4)(A) does not bar jurisdiction over this case.[4]

## III.

We now turn to the district court's grant of summary judgment to the defendants on the merits of the plaintiffs' False Claims Act claims. We review a grant of summary judgment de novo. *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995) Summary judgment is appropriate if, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Lib-*

---

3. Because the IG did not investigate the special pay bonus or wasteful hiring allegations, there is no basis for suggesting that these allegations were publicly disclosed.

4. Because we do not find public disclosure in this case, we do not address whether Hochman and Deschenes can be "original sources" of the

information for 31 U.S.C. § 3730(e)(4)(A) purposes. *See United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1420 (9th Cir.1991) (original source analysis "comes into play only if an exception is sought to the bar of [31 U.S.C. § 3730(e)(4)(A)]").

*erty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The False Claims Act establishes liability for anyone who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(1), (2) (1994).

The scienter requirement is critical to the operation of the False Claims Act and to the resolution of this case. The False Claims Act defines "knowing" as having actual knowledge of the information, or acting in either deliberate indifference to or reckless disregard for the information's truth or falsity. 31 U.S.C. § 3729(b) (1994). Congress specifically amended the False Claims Act to include this definition of scienter, to make "firm ... its intention that the act not punish honest mistakes or incorrect claims submitted through mere negligence." S.Rep. No. 99–345, at 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5272. This Court has further explained that the requisite scienter is "the knowing presentation of what is known to be false," *United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1421 (9th Cir.1991), and that " 'known to be false' does not mean scientifically untrue; it means a lie." *United States ex rel. Anderson v. Northern Telecom, Inc.,* 52 F.3d 810, 815–16 (9th Cir.1995)·(quotations omitted).

As with many False Claims Act cases, the resolution of this case is highly dependent on its facts. We review the plaintiffs' four allegations of misconduct in turn.

*Authorization of Scarce Specialty Pay*

■ Defendant Dr. Mohamed Rashad, an anesthesiologist and USCSM professor, was hired in April 1992 to develop an anesthesiology practice at the Clinic. In addition to his salary, Rashad received scarce specialty pay, a VA-authorized bonus designed to attract physicians who practice in highly demanded fields. Although Rashad did not administer general inhalation anesthesia during the first eighteen months of his employment, he performed preoperative and postoperative care and created procedures and protocol for the administration of anesthesia at the Clinic. At other times, Rashad was present or on stand-by while others administered anesthesia at the Clinic. The plaintiffs contend that these duties did not entitle Rashad to receive specialty pay.

The VA is authorized to promulgate regulations providing specialty pay, "[i]n order to recruit and retain highly qualified physicians." 38 U.S.C. § 7431(a) (1994). The statute does not detail the type of work a physician must do to merit specialty pay. Under the applicable VHA guidelines implementing specialty pay,

> [s]taff physicians and dentists who spend all of their VHA time assigned to a specialty area are entitled to 100 percent of scarce specialty pay (subject to proration for part-time employment).... For physicians and dentists who spend a portion of their time in a scarce specialty, and a portion of their time in [a] medical specialty which is not designated as a scarce specialty, the actual amount of scarce specialty pay shall be determined by the percentage of time the individual *works in the scarce specialty.*

Veterans Health Servs. and Research Admin., *Special Pay: Scarce Med. and Dental Specialties,* MP–5, Part II, Chap. 3, Sec. B, App. F (emphasis added) (VHA Guidelines). A VHA policy handbook, apparently of equal applicability at the time, sets forth potentially conflicting requirements for specialty pay by providing that "[p]hysicians and dentists who have been determined by the [chief of staff] to be specialty trained are eligible for [scarce specialty pay] based on the percentage of time they perform *direct patient care* in the specialty." VHA Handbook 5103.4 § 11(a) (emphasis added) (VHA Handbook).

The defendants argue that, even though Rashad may not have personally administered anesthesia to patients, Rashad's supervision of other anesthesiologists and his creation of preoperative and postoperative anesthesiology procedures was work within the specialty area and therefore justified specialty pay under the VHA Guidelines.

The plaintiffs contend, on the other hand, that Rashad was not entitled to specialty pay because not all of his time as a Clinic anesthesiologist was spent in "direct patient care" as required by the VHA Handbook.

Regardless of whether Rashad was actually entitled to specialty pay, the record does not support a reasonable inference that the defendants had the requisite knowledge of the alleged falsity of the authorization of specialty bonus pay. Rashad, Nackman, and Mishra all believed Rashad was entitled to the specialty pay for Rashad's work within his specialty, not just for work in direct patient care. Absent evidence that the defendants knew that the VHA Guidelines on which they relied did not apply, or that the defendants were deliberately indifferent to or recklessly disregardful of the alleged inapplicability of those provisions, no False Claims Act liability can be found. *Hagood*, 929 F.2d at 1421 ("To take advantage of a disputed legal question, as may have happened here, is to be neither deliberately ignorant nor recklessly disregardful.").

*Hiring of Unnecessary Employees*

■ The plaintiffs contend that Mishra and Nackman hired Rashad and an anesthesiology resident, defendant Dr. Wayne Caroleo, when allegedly there was no need for an anesthesiology practice at the Clinic. The plaintiffs further contend that defendants Dr. Gary Anthone and Dr. Steven Stain were hired by Nackman, on Mishra's recommendation, although the Clinic's workload allegedly did not justify hiring two new surgeons. The plaintiffs also seek to impose False Claims Act liability on Nackman and Mishra for approving the purchase of allegedly unnecessary medical equipment.

The plaintiffs' claim fails because they have not presented evidence of an essential element of their claim-that the defendants made these decisions with the actual knowledge that the expenditures were unnecessary, or with reckless disregard of or deliberate indifference to that knowledge. Indeed, the record overwhelmingly supports the opposite inference, that the defendants believed such expenditures would benefit the Clinic in the long run. *See, e.g.,* Letter from Nackman to VA Director of Operations (Aug. 23,

1990) ("At this time, we are doing only surgical procedures that can be done with local anesthesia. By hiring an Anesthesiologist, we would increase our volume of Ambulatory Surgery by doing more invasive cases with anesthesia...."). The plaintiffs at best have shown only innocent mistake or mere negligence, neither of which can form the basis for False Claims Act liability. *See Hagood*, 929 F.2d at 1421; *see also Wang v. FMC Corp.*, 975 F.2d 1412, 1420–21 (9th Cir.1992) (poor job performance and innocent mistakes are not actionable under the False Claims Act).

*Method of Compensating Residents*

■ The third series of allegations concerns the Clinic's method of compensating residents. Residents receiving training at the Clinic were compensated through a "rotating funded resident" system. Because residents worked at the Clinic for a fixed number of months before rotating to other medical facilities to continue their training, the Clinic found it administratively cumbersome to pay each resident for the time they actually worked at the Clinic. Working with other medical institutions according to widely-accepted practice, the Clinic simplified its payroll by designating one resident to receive full funding for an entire year, even after the resident had completed the rotation at the Clinic. All other residents at the Clinic would not receive any compensation from the Clinic but would be funded by other medical facilities.

The plaintiffs contend that this method of accounting resulted in the Clinic paying residents who were not working at the Clinic. Specifically, the plaintiffs point to ophthalmology resident Dr. Darrell Wudunn, who continued to receive full-time pay from the Clinic even after he completed two twomonth rotations at the Clinic. The plaintiffs seek to hold Dr. Byron Whitney liable for verifying attendance records reflecting that Wudunn was a full-time employee.

The plaintiffs have not demonstrated how Whitney's verification of the residents' attendance records constituted a false claim. The VA is authorized to hire residents and set "the customary amount and terms of pay

for such positions during the period of such employment and training." 38 U.S.C. § 7406(b) (1994) The VA's policy governing the payment of residents allows VA medical centers to continue to pay residents "while on training rotations to non-VA facilities based on the presence of exchange residents who hold VA WOC [without compensation] appointments." Veterans Health Servs. and Research Admin. Supplement, MP-5, Part II, Chap. 2, § 2.30(d). Because VA policy authorized the rotating funded resident system, no falsity can be found in Whitney's approval of Wudunn's attendance records.[5] Cf. United States ex rel. Lindenthal v. General Dynamics Corp., 61 F.3d 1402, 1412 (9th Cir.1995) (whistleblower's False Claims Act claims for payment based on work that satisfied contractual obligations "could not have been 'false or fraudulent' within the meaning of the [False Claims Act]").

*Overpayment of Physicians and Residents*

■ The plaintiffs' final allegation is that the defendants submitted and approved attendance records identifying dates and hours that certain physicians worked when, in fact, the physicians were not present at the Clinic. The plaintiffs point to apparent discrepancies of this kind with respect to several physicians who, pursuant to the Affiliation Agreement, held positions at both USCSM and the Clinic.

For example, Dr. Mary Lloyd was employed as the Clinic's full-time chief of ophthalmology from 1991 to 1992. According to Lloyd, chief of staff Mishra, and the Clinic's director Nackman, Lloyd was hired by the Clinic, under the Affiliation Agreement, to work forty hours per week in research, patient care, and education. Lloyd typically spent at least three days per week at the Clinic. The remainder of her time was spent teaching USCSM residents and performing research that the Clinic's facility was unable to support, often at USCSM. The plaintiffs level similar allegations at Rashad, Anthone, and Stain, each of whom, the plaintiffs contend, were not present at the Clinic during

their scheduled times. There was no evidence that, during the times in which any of the defendants were absent from the Clinic, the defendants were not teaching or performing research at USCSM. Rather, the plaintiffs' claim rests entirely on evidence that the defendants were paid for time that they were not physically present at the Clinic.

Without deciding whether the Affiliation Agreement in fact authorized off-Clinic teaching and research, we note that such an interpretation was not in reckless disregard of or deliberate indifference to the language, intent, and function of the agreement. Indeed, the defendants' interpretation appears at least superficially plausible. The Affiliation Agreement established an affiliation between the Clinic and USCSM "for the purpose of research, education and training," and required all full-time and part-time staff to "participate in the education and training programs within their respective services." Affiliation Agreement at 1, 3. Because the Clinic facility could not support certain teaching and research functions, by necessity much of the nonpatient care duties would need to be performed at USCSM or other off-Clinic locations. *See, e.g.,* Anthone Decl. ¶ 6 (July 26, 1996) ("The laboratory was located at USC because the [Clinic] lacks animal facilities for research projects.").

Even if the defendants erred in their interpretation of the Affiliation Agreement, the undisputed evidence demonstrates that the defendants believed that the Affiliation Agreement authorized their conduct. *See* Rashad Decl. ¶ 8 (July 28, 1996) ("All of the time that I spend on patient care, education and research count towards completion of my tour of duty."); Stain Decl. ¶ 8 (July 28, 1996) ("I was expected to perform ... patient care, research activities, and training and education activities.... Naturally, some of these were not performed at the Clinic facility, however all such activities performed during my [Clinic] tour of duty were authorized and required to be performed as a

---

**5.** To demonstrate scienter on this point, the plaintiffs rely on Whitney's testimony that he felt it was unethical to verify the residents' time records in this fashion. However, because such

verification was authorized by VA regulations and therefore was not "false" for False Claims Act purposes, Whitney's mind set is irrelevant.

condition of my employment."); Anthone Decl. ¶ 8 ("All in all, the amount of time spent in patient care, research and education totaled much more than the twenty hours a week dictated by my agreement with the VA."); Mishra Decl. ¶ 10 (July 26, 1996) ("An individual can be within his tour of duty and not necessarily be at the Clinic. Dual appointment physicians ... fulfilled their tours of duty through the performance of patient care, research and education and training."); Nackman Dep. at 121 (Feb. 26, 1996) ("Once again, all of the people that are being hired in conjunction with the university are being hired within the parameters of the affiliation and that is for education, for clinical care, and for research. So that within the context of the appointment, these individuals can perform any and all of those duties.").

Evidence of the defendants' belief in the validity of their interpretation of the Affiliation Agreement is bolstered by the conduct of Whitney, the chief of surgery. Whitney wrote memoranda to Mishra expressing concerns about the attendance data for Lloyd and other physicians. After Mishra looked into the question and informed Whitney that he believed "affiliated physician duties included research and education duties that would take them away from the Clinic," Whitney Decl. ¶ 5 (July 27, 1996), Whitney "recognized that there was no longer an issue," *id.*, and decided that he "wasn't going to fight anymore." Whitney Dep. at 106 (Apr. 5, 1996). When viewed in the light most favorable to the plaintiffs, Whitney's actions merely suggest that Mishra examined the issue and concluded that his interpretation of the Affiliation Agreement was correct, *not* that Mishra had the requisite intent-the "knowing presentation of what is *known to be false*," *Hagood*, 929 F.2d at 1421 (emphasis added)-to establish False Claims Act liability. Without sufficient evidence to support an inference that the defendants understood that they were interpreting the Affiliation Agreement incorrectly, *see id.* ("What is crucial ... is that the [defendants] knew that the information was false."), the plaintiffs' claim must fail.

Accordingly, summary judgment was properly granted to the defendants on the merits of the plaintiffs' False Claims Act claims.

### IV.

The plaintiffs' final contention is that the district judge abused his discretion in not recusing himself from this case. A judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a) (1994). Under this provision, "what matters is not the reality of bias or prejudice but its appearance." *Liteky v. United States*, 510 U.S. 540, 548, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). This Court reviews a denial of a motion to recuse for abuse of discretion. *Yagman v. Republic Ins.*, 987 F.2d 622, 626 (9th Cir.1993).

The district judge did not abuse his discretion in declining to recuse himself. The judge's main contact with USC was a small yearly contribution to the law school's alumni association. This insignificant contact would not reasonably lead one to question his impartiality, in particular because USC is not a named party and because the relationship between this case and USC's law school is virtually nonexistent. We agree with other circuits in holding that § 455(a) does not require recusal for similarly minimal alumni contacts. *See, e.g., Lunde v. Helms*, 29 F.3d 367, 370–71 (8th Cir.1994) (no abuse of discretion for failure to recuse when judge was alumnus of defendant-university's law school, made financial contributions to an alumni organization, and had presented education programs at the university); *Wu v. Thomas*, 996 F.2d 271, 274–75 & n. 7 (11th Cir.1993) (per curiam) (no abuse of discretion for failure to recuse when judge was alumnus of defendant-university, served as unpaid adjunct professor who offered internships for the university's law students, gave the university a yearly donation for football tickets, and planned to create scholarship at the university); *Easley v. University of Mich. Bd. of Regents*, 906 F.2d 1143, 1145–46 (6th Cir. 1990) (no abuse of discretion for failure to recuse when judge was alumnus of defendant-law school and member of law school alumni social organization). Accordingly, we

find no abuse of discretion in the judge's refusal to recuse himself from this case.

## V.

For the reasons stated above, we affirm the judgment of the district court.